IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 20-cv-2954

BRANDEN BLAKNEY; and
BRANDI MOORE,

    Plaintiffs,

v.

BARLO INC. d/b/a INTERSTATE ROOFING INC.; and
SCOTT RIOPELLE,

    Defendants.

---

## COMPLAINT FOR UNPAID WAGES
---

Plaintiffs Branden Blakney and Brandi Moore, by and through undersigned counsel, file this Complaint for Unpaid Wages against the above-listed Defendants.

### STATEMENT OF THE CASE

1. Defendants misclassified Plaintiffs as exempt from overtime pay and refused to pay them overtime premiums for overtime hours worked.

2. Plaintiffs performed primarily basic, clerical tasks, including serving as personal assistants for their supervisors. They did not exercise discretion and independent judgment, nor did they conduct work directly related to management policies, business operations, or the decision-making process of the executive.

3. Defendant Scott Riopelle, who employed Plaintiffs, referred to Plaintiff Brandi Moore as a "secretary" and to Plaintiff Branden Blakney as an "overpriced coffee maker."

4. Plaintiffs' job duties did not meet the requirements of any exemption under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, or Colorado Minimum Wages of Workers Act, C.R.S. §§ 8-6-101, *et seq.*, as implemented by the Colorado Minimum Wage Order ("CMWO") and Colorado Overtime and Minimum Pay Standards Order ("COMPS"), 7 C.C.R. 1103-1.[1] By failing to pay overtime wages to their non-exempt employees, Defendants violated the FLSA, the CMWO, and the COMPS.

5. Defendants also violated the Colorado Wage Claim Act ("CWCA"), C.R.S. §§ 8-4-101, *et seq.*, which requires employers to pay their employees all earned, vested and determinable wages upon the termination of the employment relationship and imposes penalties on employers who do not tender wages due upon receipt of a written demand for such wages.

6. Plaintiffs seek actual and liquidated damages, penalties, pre- and post-judgment interest, and attorney fees and costs resulting from Defendants' willful violation of their right to be paid overtime wages.

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff Branden Blakney ("Mr. Blakney") was employed by Defendants from October 1, 2018 to March 17, 2020. Mr. Blakney's signed FLSA Consent to Sue Form is attached to this Complaint as Exhibit 1.

8. Plaintiff Brandi Moore ("Ms. Moore") was employed by Defendants from February 26, 2018 to April 10, 2020. Ms. Moore's signed FLSA Consent to Sue Form is attached to this Complaint as Exhibit 2.

---

[1] The COMPS replaced the CMWO on March 16, 2020.

9. Defendant Barlo Inc. is a registered Colorado corporation with a principal street address of 1000 W. 47th Avenue, Denver, CO 80211. Barlo Inc. uses the registered trade name Interstate Roofing Inc., and is referred to hereinafter as "Interstate."

10. Defendant Scott Riopelle has at all relevant times been an owner and manager of Interstate.

11. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, this case arising under the laws of the United States. This action arises under the FLSA, 29 U.S.C. §§ 201, *et seq.*

12. Plaintiffs request that this Court exercise supplemental jurisdiction over their claims arising under the CMWO, the COMPS, and the CWCA. *See* 28 U.S.C. § 1367.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because all the events and omissions giving rise to the claims occurred in the District of Colorado.

## FACTUAL ALLEGATIONS

**Mr. Blakney Worked as an Assistant to Interstate Chief Operating Officer Dave Kersting, and as Defendant Riopelle's Personal Assistant**

14. Defendants hired Mr. Blakney to be the Executive Assistant to Chief Operating Officer ("COO") Dave Kersting.

15. Defendants paid Mr. Blakney on a salary basis.

16. Mr. Blakney worked in excess of 40 hours per week.

17. Mr. Blakney was required to assist Mr. Kersting by completing simple, routine, and clerical assignments that freed up Mr. Kersting to focus more directly on his duties as COO, specifically a full rebuild of the financial software and streamlining of processes.

18. Mr. Blakney's work for Mr. Kersting included the following examples of Mr. Blakney's primary duties during his first few months of employment with Interstate:

3

a. basic accounting functions, such as bank reconciliations, Accounts Payable, collections, and making deposits and withdrawals;

b. organizational assignments such as printing out documents and creating binders;

c. filing;

d. calling Interstate's previously used inspectors to conduct renewed fire inspections;

e. general building and office operations;

f. answering phones;

g. handling facility supplies and repairs;

h. filling the vending machine; and

i. ordering and picking up lunches.

19. Mr. Blakney also performed personal errands for Defendant Riopelle as well as his then-wife Danielle Riopelle, who was Interstate's production manager at the time.

20. In January 2019, Defendant Riopelle increased the personal assistant tasks assigned to Mr. Blakney. In fact, on many occasions, Mr. Riopelle said that he should have his own personal assistant and that Mr. Blakney was not just Mr. Kersting's assistant.

21. The personal errands Defendant Riopelle assigned to Mr. Blakney included dog grooming, moving Defendant Riopelle's personal vehicles, getting him groceries after hours, and taking calls to address any other personal needs Defendant Riopelle had.

22. Defendant Riopelle often called and texted Mr. Blakney after hours and on the weekend with "911's," which were requests for assistance with supposedly urgent personal tasks. For example, Defendant Riopelle made the following text message requests:

    a. Plane tickets to be booked, request made at 8:54 p.m. on March 6, 2019;

    b. A leash for Mrs. Riopelle's dog to be picked up, request made at 8:47 p.m. on April 12, 2019;

    c. Flowers to be ordered for Defendant Riopelle's cousin's funeral, request made at 9:32 p.m. on May 22, 2019;

    d. Cable to be turned back on, request made at 11:26 p.m. on July 1, 2019;

    e. Au pair to be taken from Mr. Riopelle's home to a different location because she was sick; request made at 10:30 p.m. on July 4, 2019; and

    f. Car insurance information to be gathered, request made at 1 a.m. on July 27, 2019.

23. Meanwhile, Mr. Blakney continued his work in assisting Mr. Kersting, which included compiling information and entering data so that Mr. Kersting and others could make decisions on selecting a new property management software and payroll company.

24. In March 2019, Mr. Blakney's work continued to shift toward doing more personal tasks for Defendant Riopelle. Defendant Riopelle demanded this increasing personal assistance from Mr. Blakney through more controlling and aggressive behavior.

25. These tasks included gathering documents for Defendant Riopelle's divorce case; delivering letters to attorneys and Defendant Riopelle's interior designers; gathering and providing information to Defendant Riopelle's accountant; grocery shopping; and moving, washing, and putting gas in cars.

26. Defendant Riopelle repeatedly berated Mr. Blakney, yelled at him, threatened to fire him, and said he was not worth what Defendant Riopelle was paying him.

27. On more than one occasion, Defendant Riopelle threw water bottles at Mr. Blakney, shook bookcases, and screamed.

28. Defendant Riopelle micromanaged Mr. Blakney's performance of Defendant Riopelle's personal tasks. Often, what drew Defendant Riopelle's ire was Mr. Blakney's failure to perform personal tasks to Defendant Riopelle's liking.

29. For example, on July 24, 2019, Defendant Riopelle became upset with Mr. Blakney because it was taking too long for the cable and internet at Defendant Riopelle's home to be set up, and because the number of cable boxes on the new bill were incorrect.

30. On August 20, 2019, Defendant Riopelle told Mr. Blakney it was his fault that the grass was dead at Defendant Riopelle's house because Mr. Blakney had "flaked" on Defendant Riopelle's landscaper. In fact, on August 4 and 5, while Defendant Riopelle was in Alaska, Mr. Blakney had taken the time to visit Defendant Riopelle's house to work on the sprinklers.

31. Defendant Riopelle also micromanaged Mr. Blakney's work that was more directly related to Interstate's business operations. For example, on October 14, 2019, Defendant Riopelle instructed Mr. Blakney to pull for him a schedule for Pepsi Center events. Mr. Blakney followed the instructions as he understood them, by making a spreadsheet of all Pepsi Center events after he could not get the online calendar to print. Defendant Riopelle called Mr. Blakney stupid, pulled a schedule just for the Denver Nuggets, and claimed that he had only asked for the Nuggets' schedule. When Mr. Blakney insisted that Defendant Riopelle had not, he told Mr. Blakney to "go the fuck home" for calling Defendant Riopelle a liar.

32. On October 29, 2019, Defendant Riopelle became upset with Mr. Blakney for apparently choosing the wrong date for booking a flight for Defendant Riopelle's non-work related travel to New York for the Macy's Thanksgiving Day Parade.

33. Following this incident, Defendant Riopelle yelled to Mr. Kersting that Defendant Blakney was an "overpriced coffee maker." The entire office, including Mr. Blakney, heard this.

34. Other things that caused Defendant Riopelle to become upset included Mr. Blakney not getting a sandwich for Defendant Riopelle's daughter, and taking too long to return Mr. Riopelle's leased truck to the dealer, when Mr. Blakney in fact had been taking care of scratches on the truck.

35. At the beginning of 2020, Defendant Riopelle required that Mr. Blakney work the reception desk any time the regular receptionist Samantha Rose was away from the desk. (Defendant Riopelle had required Mr. Blakney to work the reception desk at times prior to 2020). Over time, Defendant Riopelle required Mr. Blakney to spend half of his workday at the front desk, even when Ms. Rose was there. Mr. Blakney's duties while working the reception desk included filing, scanning, and faxing documents, and entering information on roofing leads into the company's job tracking software.

### Ms. Moore Worked as an Administrative Assistant to the Commercial Division, and as a Personal Assistant to Roland Gonzalez

36. Ms. Moore worked as an administrative assistant to Roland Gonzalez, the head of Interstate's commercial division, and John Reiter, production manager for the commercial division.

37. Defendants paid Ms. Moore on a salary basis and did not pay her overtime premiums for overtime hours worked.

38.     Mr. Gonzalez relied on Ms. Moore for assistance with his day-to-day work.

39.     Ms. Moore organized Mr. Gonzalez's schedule and his emails, and she made for him a running list of tasks.  Ms. Moore sat at Mr. Gonzalez's computer and wrote his emails, with Mr. Gonzalez standing over her.  Part of the reason Mr. Gonzalez needed this assistance was because he was not a good speller.

40.     Ms. Moore put appointments on Mr. Gonzalez's calendar.  However, he was very particular about what was on his calendar, so she had to get his approval before scheduling appointments.

41.     Ms. Moore also performed personal tasks for Mr. Gonzalez and his family, as well as errands for Mr. Riopelle.  For example, she arranged for the windshield on Mr. Gonzalez's truck to be replaced and entered his daughter's school events on his calendar.  His wife even called Ms. Moore to ask her to put appointments on Mr. Gonzalez's calendar and do things like help out with their son's school fundraiser.

42.     As the administrative assistant for the commercial division, Ms. Moore performed a variety of clerical tasks, which included the following examples of her primary duties:

   a. Assisting with accounts payable by pulling information from QuickBooks and presenting invoices for verification and signature to Messrs. Gonzalez and Reiter;

   b. Scanning and filing of commercial division documents, such as invoices, and maintaining paper files;

   c. Entering data into the commercial division's "book of business";

    d. Keeping track of roofer payments by generating forms that Mr. Gonzalez verified and approved; and scanning checks, entering the data into the system, and giving them to Controller Judith Amaya for deposit;

    e. Running and organizing profit-and-loss (P&L) reports;

    f. Downloading and printing material invoices, verifying correct taxation, obtaining signatures, and turning in the invoices for payment;

    g. Locating, copying, and sending documents and correspondence to Interstate's lawyers;

    h. Assisting in assembling Statement of Qualification packets for pitching new projects;

    i. Tracking credit card receipts;

    j. Cleaning the office;

    k. Running errands; and

    l. Taking notes at meetings.

43. Ms. Moore completed her work with Mr. Gonzalez's close supervision and oversight. When she did tasks on her own, she had to have her work verified by Mr. Gonzalez or Mr. Reiter. Her job was to prepare things for Mr. Gonzalez's approval or denial. She did not provide him with recommendations, and Mr. Gonzalez always had the final say.

44. For example, when Ms. Moore assisted with accounts payable, Messrs. Gonzalez and Reiter typically worked together to verify the numbers presented by Ms. Moore, and if everything was correct, Mr. Gonzalez signed the invoice and turned it over to corporate for payment. She would then scan and file the invoices.

45. Ms. Moore also spent some time assisting the residential division with certain tasks, including managing subcontractor files and workers compensation forms for the salespeople. Ms. Amaya oversaw Ms. Moore's performance of these tasks.

46. Ms. Moore followed detailed procedures to complete many of her tasks, such as weekly billing, generating P&L reports, lead tracking, setting up new projects, and organizing files on the server.

47. On more than one occasion Ms. Moore was the object of Defendant Riopelle's unprovoked wrath. One time, Ms. Moore was asked to set up for a meeting in Mr. Gonzalez's office. She was not told how many people would be attending, so she did not set up enough chairs. In response, Defendant Riopelle stormed into Ms. Moore's office and called her stupid and incompetent. During this rant, Defendant Riopelle referred to Ms. Moore as a "secretary."

**Plaintiffs Worked Far in Excess of 40 Hours Per Week**

48. During his initial three months of employment in 2018, Mr. Blakney averaged working over 50 hours per week.

49. From January to March 2019, Mr. Blakney worked over 50 hours per week.

50. Beginning in March 2019, Mr. Blakney's work shifted increasingly toward doing more personal tasks for Mr. Riopelle. At the same time, Mr. Blakney's workload increased as he was helping Mr. Kersting cover for Ms. Riopelle's departure from Interstate.

51. To complete his personal assistant duties for Mr. Riopelle along with his other duties to assist Mr. Kersting, Mr. Blakney worked more than 60 hours per week from March 2019 to January 2020.

52. During her first year at Interstate, Ms. Moore worked more than 60 hours per week. The excessive hours were causing strain on Ms. Moore and her life at home. She lived with her boyfriend, sister, and sister's two children, and she had helped raise the children since 2016.

53. In March 2019, after Ms. Moore pursued other employment, Mr. Gonzalez agreed to reduce her hours to 45 per week. He told Ms. Moore her hours would be 8 a.m. to 5 p.m., which would amount to 45 hours per week because Interstate employees generally did not get a lunch break.

54. Over the next year, Ms. Moore's hours did go down, but not as much as agreed. She continued to work around 50 hours per week.

### Interstate Required Plaintiffs to Clock in and out Beginning in February 2020

55. In the middle of February 2020, Mr. Riopelle told Mr. Blakney, Ms. Moore, and coworker Rodrigo Gonzalez that they had to clock in and out for all their shifts.

56. Mr. Blakney asked Mr. Kersting about this change. Mr. Kersting said that Defendant Riopelle had made this change because the company felt these employees were not in fact exempt from overtime protections.

57. After one week on the timekeeping system, Defendant Riopelle texted Mr. Blakney to say that he was working too many hours. Mr. Blakney responded that he had to work those hours to get all his work done.

58. Prior to February 2020, Interstate did not record Plaintiffs' hours worked.

### Defendants Misclassified Plaintiffs as Exempt

59. Plaintiffs were not exempt from the protections of the FLSA, the CMWO, the COMPS, or the CWCA.

11

60. Plaintiffs' primary duties were not directly related to the management or general business operations of Interstate or its customers.

61. Plaintiffs' primary duties did not include the exercise of discretion and independent judgment with respect to matters of significance.

62. Plaintiffs did not regularly perform duties important to the decision-making process of Interstate's executives.

63. Plaintiffs were not delegated authority regarding matters of significance.

64. Plaintiffs did not have authority to make independent choices, free from immediate direction or supervision.

65. Plaintiffs often applied well-established techniques, procedures, or specific standards.

66. Plaintiffs' primary duties were clerical in nature.

67. Neither Plaintiff had authority to sign invoices.

68. Plaintiffs did not direct the work of any other employees.

69. Plaintiffs did not have the authority to hire or fire other employees, nor were their suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees given particular weight.

70. Though Plaintiffs regularly worked more than 40 hours each workweek, Defendants refused to pay them any wages for overtime hours worked.

71. Plaintiffs and Defendants had no mutual agreement concerning the method and amount of overtime word that would be required, or the manner in which payment for overtime work would occur.

72. On approximately July 7, 2020, Plaintiffs each made a written demand for wages pursuant to C.R.S. § 8-4-109. Defendants have not paid the wages owed.

73. At all relevant times, Interstate was an enterprise engaged in commerce or production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203(s).

74. On information and belief, at all relevant times Interstate had a gross volume of sales in excess of $500,000.

75. Defendant Riopelle, as owner of Interstate, exercised operational and financial control over its day-to-day functions, including compensation of employees, classification of employees, and practices regarding pay and work schedules. Defendant Riopelle hired and fired his employees, made all important financial decisions regarding the enterprise, controlled his employees' rates of pay, and made the decisions to misclassify Plaintiffs as overtime exempt and to avoid paying overtime rates for overtime hours worked.

76. The CMWO covers work performed by Plaintiffs because, at all relevant times, their work was connected with and/or incidental to the retail and service industry. Interstate sold and offered for sales services, commodities, articles, goods, real estate, wares, and/or merchandise to the consuming public. Such sales generated at least 50% of Interstate's annual dollar volume of business. The goods and services offered by Interstate were not made available for resale.

77. The CMWO also covers work performed by Plaintiffs because, at all relevant times, their work was connected with and/or incidental to the commercial support service industry. Plaintiffs' duties included clerical, building maintenance, and grounds maintenance duties.

### FIRST CLAIM FOR RELIEF
### Violation of the FLSA (29 U.S.C. §§ 201, *et seq.*)

78. Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

79. Plaintiffs were "employees" as that term is defined by the FLSA. 29 U.S.C. § 203(e).

80. Defendants "employed" Plaintiffs as that term is defined by the FLSA. 29 U.S.C. § 203(g).

81. Defendants were Plaintiffs' "employers" as that term is defined by the FLSA. 29 U.S.C. § 203(d).

82. Plaintiffs were non-exempt employees under the FLSA.

83. Defendants misclassified Plaintiffs as employees exempt from overtime compensation in violation of the FLSA.

84. Plaintiffs are owed pay, including overtime premiums, for hours they worked beyond 40 in each given workweek. 29 U.S.C. § 207.

85. Defendants' misclassification of Plaintiffs as exempt from overtime pay was not made in good faith.

86. Defendants' violations of the FLSA were willful. 29 U.S.C. § 255(a).

87. Plaintiff have suffered lost wages and lost use of those wages in an amount to be determined at trial.

88. Plaintiff and others are entitled to recover unpaid overtime premiums, liquidated damages, attorney fees, and costs.

**SECOND CLAIM FOR RELIEF**
**Violation of the Colorado Minimum Wages of Workers Act (C.R.S. §§ 8-6-101, *et seq.*), as Implemented by the CMWO and the COMPS (7 C.C.R. 1103-1)**

89. Plaintiffs repeat and reallege each of the allegations above as if fully set forth herein.

90. Defendants were Plaintiffs' "employers" as that term is defined by the CMWO and the COMPS, because they employed Plaintiffs in Colorado.

91. Plaintiffs were Defendants' "employees" as that term is defined by the CMWO and the COMPS, because they performed labor for the benefit of Defendants in which Defendants commanded when, where, and how much labor they would perform.

92. Plaintiffs were non-exempt employees under the CMWO and the COMPS.

93. Defendants misclassified Plaintiffs as employees exempt from overtime compensation in violation of the CMWO and the COMPS.

94. Defendants violated the CMWO and the COMPS when they refused to pay Plaintiffs overtime wages for all hours worked beyond forty each workweek.

95. Defendants' violations of the CMWO and the COMPS were willful and not in good faith.

96. Plaintiffs suffered lost wages and lost use of those wages in an amount to be determined at trial.

97. Plaintiffs and others are entitled to recover unpaid wages, attorneys' fees, and costs of the suit.

**THIRD CLAIM FOR RELIEF**
**Violation of the CWCA (C.R.S. §§ 8-4-101, *et seq*.)**

98. Plaintiffs repeat and reallege each of the above allegations as if fully set forth herein.

99. Defendants were Plaintiffs' "employers" as that term is defined by the CWCA because they employed Plaintiffs in Colorado. C.R.S. § 8-4-101(6).

100. Plaintiffs were Defendants' "employees" as that term is defined by the CWCA because they performed labor for the benefit of Defendants. C.R.S. § 8-4-101(5).

101. Defendants violated the CWCA when they failed to pay Plaintiffs all earned, vested and determinable wages upon termination of employment and upon receipt of Plaintiffs' demands therefor. C.R.S. § 8-4-109.

102. As a result, Plaintiffs suffered lost wages and lost use of those wages in an amount to be determined at trial.

103. Plaintiffs are entitled to recover in a civil action all earned, vested, and determinable wages owed to them, statutory penalties and attorney fees and costs of suit. C.R.S. § 8-4-109; Colo. Rev. Stat. § 8-4-110.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award Plaintiffs:

a. Unpaid wages and overtime premiums;

b. Liquidated damages;

c. Penalties under C.R.S. §§ 8-4-109 and -113.

d. Pre-judgment and post-judgment interest as permitted by law;

e. Costs and attorney fees; and

f. Further relief that this Court deems just and proper, and any other relief as allowed by law.

Respectfully submitted,

*s/Arash Jahanian*
**Arash Jahanian**
The Meyer Law Office, P.C.
P.O. Box 40394
Denver, CO 80204
Office: (303) 831-0817
Fax: (720) 210-9858
arash@themeyerlawoffice.com

16

**Brandt Milstein**
MILSTEIN LAW OFFICE
2400 Broadway, Suite B
Boulder, CO 80304
303.440.8780
brandt@milsteinlawoffice.com

*Attorneys for Plaintiff*

17